## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADAM SORKIN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FORTUNE MEDIA (USA) CORPORATION,<br><br>Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Adam Sorkin ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this class action complaint against Defendant Fortune Media (USA) Corporation ("Fortune" or "Defendant"). Fortune owns and operates the website located at https://fortune.com (the "Website"), which provides users with access to online articles, videos, and other multimedia content covering business, finance, technology, leadership, and related news and informational programming.

## NATURE OF THE ACTION

1. In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. When a company affirmatively represents that users may control whether their data is sold, shared, or tracked, but then secretly sells, shares, and tracks that data anyway, the misconduct is especially egregious.

2. Fortune operates a website, https://www.fortune.com (the "Website"), a high-traffic, consumer-facing digital media platform that publishes business news, pre-recorded

2

videos, financial reporting, rankings, and informational content relating to companies, markets, technology, leadership, and consumer topics, through which users can also create and manage user accounts. Like many modern websites, the Website displayed a banner upon navigation to the Website, which purported to give users meaningful control over the Website's sharing and/or sale of their personal data with third parties ("Privacy Banner").



*Figure 1 – Fortune's Privacy Banner, representing that users may opt out of the sale or sharing of their personal information by selecting "Do Not Sell or Share My Personal Information" or "Reject All."*

3.      Defendant's assurances were false. The Website began placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of transmitting users' data the moment users visit the Website, before they can interact with the Privacy Banner and consent to the sale or sharing of their personal data.

4.      Users were misled by Defendant's Privacy Banner, which reasonably led users to believe that their data would only be shared with their affirmative consent.

5.      The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data may include webpages and products viewed or purchased;

3

inferred interests, preferences, age, location, or other characteristics based on users' behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of users across sessions and websites, users' email addresses, and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to herein as "Sensitive Information." This Sensitive Information is collected the moment a user arrives on the Website.

6.     Via the Privacy Banner, the Website offered users the ability to opt-in and consent to the use, sale, and/or sharing of their personal data via the Website's use of the Tracking Tools by clicking the "Accept All" button. The Privacy Banner also purportedly allowed users to reject the sale or sharing of their personal data and disable non-essential Tracking Tools by: (1) clicking the "Do Not Sell or Share My Personal Information" button in the Privacy Banner; or (2) clicking the "Reject All" button in the Privacy Banner. Taking any other action than clicking "Accept Cookies" *should* result in the same outcome: disallowing the sale or sharing of user data and limiting the Website's use of Tracking Tools to only cookies that are strictly necessary for the Website to function, or otherwise disabling Tracking Tools that would record and/or share users' Sensitive Information.

7.     However, even after users affirmatively rejected the sale or sharing of their data, regardless of which mechanism was used to achieve that goal, the Website continued to utilize and deploy certain Tracking Tools, which transmit users' data to the advertising, social media, and analytics companies that designed and operated the Tracking Tools (the "Tracking Entities").

8.     Fortune's Privacy Banner was deceptive because (1) the Website placed Tracking Tools on users' browsers, which allowed Tracking Entities to intercept users' communications

with the Website, before users had the ability to consent to the Website's use of Tracking Tools via the Privacy Banner, and (2) the Website continued to use Tracking Tools that intercept and transmit users' Sensitive Information to the Tracking Entities even after users rejected any selling or sharing of Sensitive Information. Fortune's Website design and procurement of the analytics companies and Tracking Tools to monitor, intercept, and transmit users' data constitutes, *inter alia*, an actionable invasion of privacy and fraud. Misrepresenting the effectiveness of opt-in consent mechanisms, such as the Website's Privacy Banner, and a user's ability to consent to the sale/sharing of their Sensitive Information effectively deprives users of control over their Sensitive Information and their privacy.

9.      In short, via the Website's Privacy Banner, Defendant materially misled users about the use and sale of their data, lulling them into a false sense of security, privacy, and control while simultaneously enabling the analytics companies to monitor, intercept, and transmit their online behavior in real time. Such conduct deprived users of control over their Sensitive Information and violated fundamental privacy protections.

10.     Sometime between May of 2025 and January 14, 2026, Defendant removed the Privacy Banner from the Website. However, Defendant did not remove the Tracking Tools from the Website and continues to place them without user consent.

11.     The Website is engaged in the delivery of prerecorded audiovisual materials. The Website offers users the option to subscribe to the Website by providing an email address in order to create an account, or by paying for enhanced access to the Website, which allows users to watch videos (the "Subscribers").

12.     The Website attracts substantial online traffic, hosting tens of millions of monthly visits, with users spending significant time engaging with the Website's content and navigating

across multiple pages. The Website is designed to encourage user interaction through embedded links, videos, article recommendations, rankings pages, newsletters, and topic-specific sections such as finance, health, technology, and personal finance. The Website monetizes user visits through advertisements on webpages and videos.

13.   The Website continues to deploy and transmit user data via the Tracking Tools to the Tracking Entities. These Tracking Entities include, at a minimum, Piano Media ("Piano"), The TradeDesk, Meta Platforms, Inc. ("Meta") (formerly Facebook, Inc.), and Google LLC ("Google"), and, on information and belief, additional advertising technology partners. The Tracking Tools (including cookies) track users' browsing history, Website interactions, inputs, device information, session data, and unique identifiers across the Website.

14.   Plaintiff visited Defendant's Website at least once in January 2026 in order to read articles, watch videos, and browse other digital content. Plaintiff maintained an account with the Website and subscribed to newsletters and email updates through his Gmail account, providing his email addresses in exchange for access to news updates. When Plaintiff interacted with the Website in January 2026, his Sensitive Information was disclosed to Tracking Entities, after which he began receiving unsolicited advertisements related to the content he viewed. During at least one such visit, Plaintiff attempted to disable Tracking Tools by rejecting the Website's use of all Tracking Tools and declining the sale/sharing of his personal information, relying on Defendant's representations in the Privacy Banner that users had the ability to meaningfully control the Website's data collection, sharing, and use. Plaintiff reasonably believed that rejecting all Tracking Tools and declining the sale/sharing of his personal information would deactivate the Tracking Tools. Nevertheless, rejecting all Tracking Tools and declining to consent to the sale/sharing of his personal information did not disable the Tracking Tools. Defendant's Website

continued to collect, disclose, and transmit Plaintiff's Sensitive Information to Tracking Entities for advertising and analytics purposes, i.e., to make more money. Plaintiff would not have used the Website had he known that his Sensitive Information would be disclosed to unauthorized Tracking Entities without his consent.

15.     Defendant does not disclose that users' Sensitive Information, including personally identifiable information ("PII"),[1] would be captured by the Tracking Tools and then transmitted to Tracking Entities. Specifically, Defendant exposed the PII of Subscribers to the Tracking Tools, which sent the PII to the Tracking Entities without the consent of the Subscribers.

16.     Defendant's conduct allowed the Tracking Entities to unlawfully intrude into Plaintiff's Sensitive Information, private communications, invade Plaintiff's fundamental right to privacy, and misrepresented the Website's data-collection practices. In doing so, Defendant violated the federal Wiretap Act ("Wiretap Act"), 18 U.S.C. § 2510, et seq.; the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, et seq.; and common law, including unlawful intrusion upon seclusion, common law fraud and deceit, and unjust enrichment.

## PARTIES

17.     Plaintiff Adam Sorkin is, and has been at all relevant times, a citizen of Illinois. Plaintiff Sorkin used Defendant's Website to read articles and watch videos. Plaintiff Sorkin has an account with the Website via Gmail, providing his email address in exchange for access to news from the Defendant's Website. Through Defendant's placement of Tracking Tools on the Website, users' personal information, including browsing activity and device identifiers, was tracked as soon as they visited the Website. Plaintiff Sorkin visited Defendant's Website on

---

[1] 18 U.S.C. § 2710(a)(3) ("includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider").

January 5, 2026, whereupon his Sensitive Information was disclosed to the Tracking Entities. Plaintiff Sorkin attempted to use the Website's Privacy Banner to decline all non-essential Tracking Tools and to reject the sale/sharing of his Sensitive Information. Despite Defendant's assertions, choosing to decline all non-essential Tracking Tools did not disable the Tracking Tools. The Website continued to track Plaintiff Sorkin and intercept his personal information, including browsing activity and device identifiers, after he chose to decline the marketing cookies. Thereafter, Plaintiff Sorkin began receiving unsolicited advertisements related to the content he viewed. Plaintiff Sorkin would not have used the Website had he known that his Sensitive Information would be disclosed to unauthorized Tracking Entities without his consent.

18.     Fortune Media (USA) Corporation is a foreign business corporation incorporated under the laws of the State of Delaware, authorized to do business in New York. Fortune's principal executive office and principal place of business are located at 40 Fulton Street, New York, NY 10038, United States. Fortune conducts business in New York and throughout the United States, including by operating and distributing digital content through the Fortune website and related online platforms.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2510, et seq., and the Video Privacy Protection Act, 18 U.S.C. § 2710. This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class

defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

20.     This Court has personal jurisdiction over Defendant because Defendant is registered to do business in this District and maintains its principal place of business in this District.

21.     Venue is proper in this Court because Defendant's principal place of business is located in this district, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

<b><u>COMMON FACTUAL ALLEGATIONS</u></b>

**I.      Legislative Background**

    **A.      The Federal Wiretap Act**

22.     The original version of the Wiretap Act (the Communications Act) was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."[2]

23.     The Wiretap Act initially focused on government wiretapping; however, Congress later became concerned that technological developments such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing" had outpaced the statute.[3] Thus, in 1986, Congress amended the Wiretap Act through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions comparable to government intrusions.[4]

---

[2] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).

[3] Senate Rep. No. 99-541, at 2 (1986).

[4] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).

24.     The ECPA primarily focused on two types of computer services that were prominent in the 1980s: (i) electronic communications between users; and (ii) remote computing services like cloud storage or third-party processing of data and files.[5]

25.     Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person "intentionally intercepts…or procures any person to intercept…any…electronic communication,"[6] "intentionally discloses…To any other person the contents of any …Electronic communication, knowing or having reason to know that the information was obtained through the interception of a[n]…Electronic communication in violation of this subsection,"[7] or "intentionally uses…the contents of any…electronic communication, knowing or having reason to know that the information was obtained through the interception of a[n]…Electronic communication in violation of this subsection.[8]

26.     The Wiretap Act initially concerned the government's use of wiretaps, but Congress became concerned that technological advancements such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing" were rendering the statute out of date. 18 U.S.C. §2511(2)(d).

27.     While users communicated with Defendant on the Website through their browsers, the contents[9] of those communications were intercepted by Tracking Entities through the Tracking Tools.

---

[5] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).
[6] 18 U.S.C. § 2511(1)(a).
[7] 18 U.S.C. § 2511(1)(c).
[8] 18 U.S.C. § 2511(1)(d).
[9] The contents of Plaintiff's and users' communications include: 1) search terms submitted to the site; 2) the location and contents of webpages visited by users; and 3) the PII discussed in Section III(A).

28.     Defendant intentionally implemented the Tracking Tools on the Website to intercept Plaintiff's communications and transmit those communications to Tracking Entities for use in advertising and marketing activities.

29.     Plaintiff neither knew of nor consented to the exposure of his legally protected communications with Defendant to the Tracking Entities.

**B.       The Video Privacy Protection Act**

30.     The events leading to the enactment of the VPPA arose in 1988, when a newspaper published the video rental history of Supreme Court nominee Judge Robert H. Bork's family. During the subsequent floor debate, members of Congress stated that:

> In an era of interactive television cables, the growth of computer checking and check-out counters…all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch…I think it is something that we have to guard against.[10]

31.     Congress recognized that "information pools" created privacy interests that impacted individual expression, association, and the exercise of constitutional freedoms.[11]

32.     Senator Patrick Leahy and the late Senator Paul Simon observed that records of this nature offer: "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."[12]

---

[10] S. Rep. 100-599, at 5-6.
[11] S. Rep. 100-599, at 7.
[12] *Id.* at 7-8 (statements of Sens. Simon and Leahy, respectively).

33. Senator Simon complained that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes."[13]

34. Senate Bill 2361 was then drafted to "give meaning to, and thus enhance, the concept of privacy for individuals in their daily lives" by prohibiting "unauthorized disclosures of personal information held by video tape providers."[14]

35. The VPPA regulates the disclosure of information about consumers' consumption of video content, imposing specific requirements to obtain consumers' consent to such disclosure. Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

36. The statutory damages were deemed "necessary to remedy the intangible harm caused by privacy intrusions."[15]

37. In 2012, Congress amended the VPPA. In so doing, Congress reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

38. During a Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to

---

[13] *Id.* at 6-7.
[14] *Id.* at 6.
[15] *Id.* at 8.

privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[16]

39.     Multiple courts have applied the VPPA to online video services, including websites that stream prerecorded content.[17]

40.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

41.     The VPPA defines personally identifiable information (PII) as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

42.     Congress designed the VPPA to protect transactions in which a consumer requests or obtains specific video materials or video services from a VTSP. The statute covers such transactions, whether they occur digitally or in physical form.

43.     A video tape service provider ("VTSP") is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

44.     Courts have interpreted the VPPA's definition of a video tape service provider broadly. A provider need not deal exclusively in audio visual content; it suffices that such content

---

[16] *See Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY COMMITTEE SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW, *available at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited May 6, 2026).

[17] *See, e.g., Sellers v. Bleacher Report, Inc.,* No. 23-cv-00368-SI, 2023 U.S. Dist. LEXIS 131579, at *15-18 (N.D. Cal. July 28, 2023) (VPPA sufficiently applied to sports news website); *Jackson v. Fandom, Inc.,* No. 22-cv-04423-JST, 2023 U.S. Dist. LEXIS 125531, at *6 (N.D. Cal. July 20, 2023) (VPPA applies to gaming and entertainment website); *Louth v. NFL,* No. 1:21-cv-00405-MSM-PAS, 2022 U.S. Dist. LEXIS 163706, at *11-12 (D.R.I. Sep. 12, 2022) (holding VPPA applied to NFL's videos accessible through mobile app).

13

forms part of the provider's business. *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 547-48 (2d Cir. 2024).

45.    Consumer is defined as "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1). The broad language defining consumer comports with the initial purpose of the VPPA.

46.    In interpreting the VPPA, a 'consumer' includes a renter, purchaser, or subscriber of any of a provider's 'goods or services,' whether audiovisual or not. *Salazar*, 118 F.4th at 548-49.

47.    Defendant delivers and provides prerecorded audio-visual materials to Plaintiff and the Class Members through the Website.

48.    Plaintiff and Defendant maintained a consumer relationship involving the request for and delivery of prerecorded video content.

49.    Defendant disclosed Plaintiff's PII to the Tracking Entities in a knowing and systematic manner, without obtaining Plaintiff's consent.

## II.    How Websites Work

50.    Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a visitor's internet browser, as the browser loads and processes the website's code to display the webpage.

51.    Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[18]

---

[18]    *Browsing    the    Web*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited May 6, 2026).

52.     Each webpage has a unique address, and two webpages cannot be stored at the same address.[19]

53.     When a visitor navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that visitor's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[20]

54.     An IP address is "a unique address that identifies a device on the Internet or a local network." Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[21]

55.     When a visitor's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfills this request, it issues a response (the "HTTP Response"), which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage by the visitor's browser upon arrival.[22]

56.     This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

---

[19] *Id.*

[20] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited May 6, 2026).

[21] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited May 6, 2026).

[22] *Id.*

57.     The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[23] as depicted below:



*Figure 2 - Mozilla's diagram of a URL, including parameters[24]*

58.     Website owners or web developers write and manage the URLs for their websites.

59.     URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[25] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

60.     The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[26] Today, UTF-8 is the Internet's most common character encoding.[27]

61.     URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[28] To demonstrate:

---

[23] To see examples of how Defendant used parameters to provide additional information here, *see infra,* Section C(2).
[24] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited May 6, 2026).
[25] *Id.*
[26] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited May 6, 2026).
[27] *UTF-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Jan 07, 2025).
[28] *What IS URL Decoding and URL Encoding?*, GOCHYU (last modified May 5, 2026) https://gochyu.com/blog/url-encode-decode (last visited May 6, 2026).



*Figure 3 – Demonstrating URL encoding and decoding[29]*



*Figure 4 – Sample webpage used to demonstrate a webpage URL*

---

[29] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited May 6, 2026).



*Figure 5 – Request URL Header of sample webpage from Figure 4, encoded for transmission (compare with decoded URL in Figure 6)*



18



*Figure 6 – Decoded, parsed Payload data from Request URL in Figure 4, showing easy-to-read parameters and metadata*

62.    After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code of the webpage, which is then processed by the user's browser, as it arrives,[30] and rendered into a visual display according to the HTML code's instructions.[31] This is the visible, usually interactive, website most people think of.

63.    To provide more complex website functionalities, website developers will include more complex commands written in non-HTML computer programming languages, such as JavaScript snippets, which are embedded or called within the HTML code.[32]

---

[30] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 20, 2026).

[31] What Is a URL?, MOZILLA, (last visited Feb. 17, 2026).

[32]    *See    JavaScript:    Adding    interactivity,* MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited May 6, 2026).

64. Such complex tasks include scheduling appointments or monitoring and reporting visitor activity.

65. In short, the Internet relies on a constant back-and-forth stream of requests being sent between the visitor and servers.

66. Unbeknownst to users, as they browse the Website, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests that make up users' communications with the Website.

### III.    The Website and the Tracking Tools

67. On the Website, Defendant utilized Tracking Tools, including those created by the Tracking Entities Facebook, Piano, TradeDesk, and Google, to intercept and disclose users' Sensitive Information without seeking or obtaining users' consent.

#### A.    Meta Pixel

68. Meta offers its own tracking pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Meta.

69. The Meta Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook social media account to its Meta Pixel, then add code to the website to use the Meta Pixel.[33]

70. Upon creating a Meta Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[34] This Pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a pre-determined library of code related to that ID, or otherwise by identifying the website owner's

---

[33] *Setup    and    install    the    Meta    Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited May 6, 2026).
[34] *Id.*

Facebook account used receive the collected data when programming the Pixel directly into a website.[35]

71.     This Pixel ID must match "a known Pixel ID" in Meta's system,[36] and is transmitted by the Meta Pixel.[37]

72.     As Meta notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[38]

73.     The Meta Pixel is employed by Defendant to gather, collect, and then share user information with Meta.[39] Receiving this information enables Meta and Defendant to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[40]

74.     The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[41]

75.     Once implemented on a website, the Meta Pixel begins to share users' information the moment a user lands on the website.

---

[35] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited May 6, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[36] *Meta Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited May 6, 2026).

[37] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited May 6, 2026).

[38] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited May 6, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[39] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited May 6, 2026).

[40] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited May 6, 2026).

[41] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited May 6, 2026).

21

76.    When a Facebook account holder logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the user's device.[42] These cookies allow Meta to link the data it receives through the Meta Pixel to individual Facebook account holders.

77.    The c_user cookie, for example, contains a series of numbers (the visitor's Facebook ID, or "FID") to identify a visitor's profile.

*Figure 7– Sample c_user cookie, containing FID of test account created by Plaintiff's counsel to investigate the Meta Pixel*

78.    The FID can simply be appended to www.facebook.com/ to navigate to the visitor's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 7,* appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the UID, as depicted below:

---

[42] *Cookies Policy: What are cookies, and what does this policy cover?*, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited May 6, 2026).



*Figure 8 – Sample Facebook account created by Plaintiff's counsel to investigate the Meta Pixel, with FID highlighted in URL*

79.     The Meta Pixel tracks user activity on web pages by monitoring events, which, when triggered, cause the Meta Pixel to automatically send data, including users' Sensitive Information, directly to Meta.[43] Examples of events utilized by websites include a user loading a page with a Meta Pixel installed (the "PageView event");[44] The Website utilizes this PageView event.[45]

---

[43] *Id., see generally.*

[44]*Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited May 6, 2026).

[45] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited May 6, 2026).

23

80.    Defendant's use of the Meta Pixel also transmits their unique Meta Pixel ID via the "id" parameter, which contains Defendant's Meta Pixel ID of "2587034314640071".

81.    Defendant uses the Meta Pixel to monetize their Website users' Sensitive Information.

82.    Meta independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Through the use of users' Sensitive Information, Meta refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

83.    Defendant's use of the Meta Pixel on the Website is demonstrated by the screenshots below, which follow a visitor's journey on the Website.



*Figure 9 – Meta tracking a user while browsing this sample news article*







*Figure 10 – Meta Pixel tracking a visitor landing on the webpage through the "PageView" event*

84.     When a business applies with Meta to use the Meta Pixel, it is provided with details about its functionality, including with respect to private information.[46]

85.     To make use of the Meta Pixel, Defendant agreed to Meta's Business Tool Terms (the "Meta Terms").

86.     The Meta Terms inform website owners using Meta's Pixel that the employment of the Meta Pixel will result in data sharing, including with Meta, through the automatic sharing of Meta Pixel Event information and contact information.[47]

87.     The Meta Terms are transparent that Meta will use the Meta Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Meta Pixel Event information]."[48]

88.     Meta directs parties implementing the Meta Pixel—here, Defendant—to encrypt request information[49] *before* data can be shared.[50]

---

[46] *See Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 6, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your website users to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

[47]     *Meta       Business       Tools       Terms*,       FACEBOOK       (Nov.       3,       2025), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403Ds PEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited May 6, 2026).

[48] *Id.*

[49] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Meta Pixel method, which makes users' information visible. *Id.*

[50] *Id.*

89.     Meta further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

90.     Meta educates or reminds Meta Pixel users of their responsibility to inform their users of their website's data sharing and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with Tracking Entities.[51]

91.     As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Meta's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

## B.      The Piano Analytics Tool

92.     Piano is a digital revenue optimization company whose products are aimed at improving digital interactions between companies and their customers.

93.     One of the tools offered by Piano is Analytics Data Collection ("Piano Analytics"), which Piano recommends be powered by its Piano Analytics SDK.[52]  Piano Analytics tracks events and other actions taken by a visitor on the website.

94.     Piano Analytics data can be gathered in one of two ways: (1) it can be gathered client-side, meaning that the data is sent from the browser of a visitor of the site directly to Piano,

---

[51] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited May 6, 2026).
[52] *Piano Analytics Data Collection,* PIANO, https://analytics-docs.piano.io/en/analytics/v1/piano-analytics-data-collection (last visited May 6, 2026).

or (2) it can be gathered server-side, meaning that the data is sent from Defendant's server directly to Piano.[53]



*Figure 11 – User data being sent directly to Piano, where the intermediary node represents Piano's software operating on users' browsers*

95.    When the data is sent client-side, a website user's browser sends an HTTP POST request to Piano. POST requests can be used by browsers to send data to a server.[54] This POST request contains information about the actions of the visitor, such as the URL of the page they visited, as well as data about the visitor themselves, such as their email address, location, or IP address.

96.    The information Piano Analytics intercepts is used by Defendant to better understand who its customers are and how they navigate around the Website.

97.    Defendant has implemented Piano Analytics on the Website, allowing Piano to intercept users' Sensitive Information without users' consent. Any ordinary user can view the data intercepted by Piano Analytics by accessing the dev tools on their browser, which allows an ordinary viewer to view every request a website is sending to and from other servers. The figure below demonstrates the Piano Analytics on the Website.

---

[53] *Id.*

[54] *HTTP Request Methods,* W3SCHOOLS, https://www.w3schools.com/tags/ref_httpmethods.asp (last visited May 6, 2026).



*Figure 12 – The Piano Analytics on the Website on the Webpage from Figure 4*

98.    As shown in *Figure 12* above, Piano Analytics causes a user's browser to send a POST request to Piano at the same time that it requests the next webpage from the Website. Piano Analytics intercepts this request and reads its contents while it is in transit to the Website.

99.    The POST request sent to Piano contains both a text file, which can be viewed in the Payload tab of the dev tools, as well as further information describing the visitor, which can be viewed in the Preview and Response tabs of the dev tools. The figure below demonstrates the Payload tab.



*Figure 13 – Combined screenshots showing contents of the Payload Tab of the Piano Analytics on the Webpage from Figure 4*

100.    Piano Analytics causes a user's browser to send the URL of the webpage that a visitor is viewing, as well as the title and description of the webpage.

101.    At all times, an ordinary person can view this information simply by accessing the Payload tab in their internet browser's dev tools.

102.    Piano Analytics also sends additional information about the user, including information that personally identifies them. This information is found in the Preview and Response tabs of the browser's dev tools. The figures below demonstrate the Preview and Response tabs.

```
eventExecutionContext: {executionId: "1808sfg0bk-00003714cm93384khgqf56gh7g", ex
   accessList: []
   activeMeters: []
   allMeters: []
   companyName: "optimum online"
   countryCode: "US"
   creditStates: []
   currentMeterName: null
   dmaCode: 501
   executionId: "1808sfg0bk-00003714cm93384khgqf56gh7g"
   experienceId: "EXTO6KW1SUAE"
   experienceVersion: 1
   frequency: null
   region: "us-ny"
   session: null
   splitTests: []
   trackingId: "N/A"
 ▾ user: {uid: "PNIe42ffdt8ru85", firstName: "▒▒▒▒", lastName: "▒▒▒▒", premiu
      email: "▒▒▒▒▒▒@gmail.com"
      firstName: "▒▒▒▒"
      lastName: "▒▒▒▒"
      premium: "false"
      uid: "PNIe42ffdt8ru85"
```

*Figure 14 – The Preview Tab of Piano Analytics POST Request triggered by visiting Webpage from Figure 4 (Email and name are censored to preserve the privacy of the investigator, whose information is accurately represented)*

32

```
"user": {
    "uid": "PNIe42ffdt8ru85",
    "firstName": "███████",
    "lastName": "██████",
    "premium": "false",
    "email": "██████████@gmail.com"
},
"region": "us-ny",
"countryCode": "US",
"companyName": "optimum online",
"dmaCode": 501,
```

*Figure 15 – The Response Tab of Piano Analytics POST Request triggered by visiting Webpage from Figure 4 (Email and name are censored to preserve the privacy of the investigator, whose information is accurately represented)*

103.    Piano Analytics causes a user's browser to send identifying information to Piano, including their first and last name, unencrypted email address, an assigned, unique ID, and approximate geographic location.

104.    All the aforementioned information, including the user's first and last name, email address, URL, and video description, is sent via the same transmission at the exact same time through Piano Analytics.

105.    At all times, an ordinary person can view this information simply by accessing the Preview and Response tabs in their browser's dev tools.

106.    Using the data that is sent to Piano, which is visible and understandable to an ordinary person, any person can determine the identity of a Website user or Subscriber and the actions, including which webpages the user and/or Subscriber visited and which videos were requested and watched, along with actions taken by the user and/or Subscriber on the Website.

107.    Piano makes it clear to its customers that it is their responsibility to obtain and manage consent from website users.[55] Piano asks its customers to display a privacy banner when using its service. Defendant does not currently display a privacy banner on the Website. Even when the Website did display the Privacy Banner, it did not stop the transmission of this information to Piano.

108.    Piano independently benefits from the use of user data collected by Piano Analytics. Piano's Terms and Conditions for its services state that it can use collected data for its own purposes.[56]

109.    Piano uses data from its clients, including Defendant, to "access, reproduce, display, and create reports" and to distribute those reports to third parties.[57] While websites "can easily populate" their "customer record" data in Piano Audience, "the Piano platform provides additional benefits . . . in that it makes a variety of additional data available right out of the box," including "third-party identifiers" and data previously ingested by Piano, which includes "[k]nown user data, sociodemographics, customer type, etc."[58] This provides business advantages to Piano and enhances the value of its platform, the access to which is sold to websites, allowing Piano to monetize its data collection practices.[59]

---

[55] *Consent management,* PIANO, https://analytics-docs.piano.io/en/analytics/v1/consent-management (last visited May 6, 2026).

[56] *Piano Master Services Agreement - Terms and Conditions*, PIANO, https://www.piano.io/legal/msa-dpa (last visited May 6, 2026).

[57] *Id.*

[58] *Customer Data Integration*, PIANO, https://www.piano.io/product/audience/customer-data-integration (last visited May 6, 2026).

[59] *See What does it really cost to own an analytics platform Software, migration, and maintenance costs explained*, PIANO, https://www.piano.io/resources/analytics-platform-tco-software-migration-and-maintenance-costs-explained (suggesting pricing features change depending on the pricing model and features needed) (last visited May 6, 2026); *GA4 vs. Piano Analytics: Which Is Right for Your Business?*, QEDGE, https://www.qedge.ai/blog/ga4-vs-piano-analytics.html#:~:text=Piano%20Analytics%20is%20a%20paid%20analytics%20platform%20designed%20specifically%20for,their%20content%20and%20drive%20revenue (suggesting as of 2023, pricing started at $499 a month) (last visited May 6, 2026).

### C.    Google Tracking Tools

110.    Google offers a range of advertising products, each serving a distinct function within advertising portfolios.

#### 1.    Google Ads

111.    Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web users.[60]

112.    The process advertisers using Google Ads to display ads within text-based search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's search results;[61] (iii) Google then allows advertisers to bid on those various keywords;[62] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

113.    Google AdSense works in conjunction with the Google Ads bidding system and allows website owners to display Google Ads on their websites and earn a revenue share when ads are viewed or clicked.[63] The search terms bid on through Google Ads are used by website owners participating in Google AdSense, allowing those owners to share in advertising revenue generated by Google.

---

[60] *Achieve all your goals in one place*, GOOGLE, https://ads.google.com/home/goals/ (last visited May 6, 2026).

[61] *Be just a Google Search away*, GOOGLE, https://ads.google.com/home/campaigns/search-ads/ (last visited May 6, 2026).

[62] *Id*.

[63] *Google AdSense Home*, GOOGLE, https://www.google.com/adsense/start/how-it-works/ (last visited May 6, 2026).

114.    AdSense for content or AdSense for search are methods by which AdSense functions.[64] In either configuration, AdSense matches advertisements to website users based on website content and user activity.

115.    Google Ads intercepted Plaintiff's page views, as depicted below, using the sample webpage.



*Figure 16 – Google Page Ads Intercepting Page Views on the Website*

116.    Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

117.    Through Google AdSense, Google aggregates search data collected from website users. Google uses that data to improve its services and deliver more relevant search results. By analyzing patterns and trends in visitor behavior, Google gains insight into what users search for

---

[64] *AdSense revenue share*, GOOGLE, https://support.google.com/adsense/answer/180195?hl=en (last visited May 6, 2026).

and what interests them. That insight supports service improvements, product development, and revenue growth.

118.    Google's collection and analysis of search results also allows it to improve its machine learning algorithms.[65] Google uses data on how users interact with search results to train its algorithms to provide more accurate and relevant search results.[66] For example, when a user clicks on a particular search result and spends more time on that page, Google treats that interaction as a signal of relevance to the search query. By aggregating such data across users, Google can develop advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.[67]

119.    Google profits in several ways from the Website's use of the Google search engine: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense search, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate user search data allows Google to further tailor its products to advertisers and users by training its algorithms on large volumes of search data.

### 2.    Google Analytics

120.    Google Analytics ("GA") collects data about visitor interactions with a website. That data includes link clicks, button clicks, form submissions, conversions, shopping cart abandonment, items added to or removed from carts, file downloads, scrolling behavior, video views, call-to-action performance, table-of-contents clicks, and other customizable events.[68]

---

[65] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited May 6, 2026).

[66] *Id.*

[67] *Id.*

[68] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited May 6, 2026).

121.    GA transmits collected interaction data to Google, which associates the activity with the website that generated it.[69] Notably, Google notifies web developers that developers should provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[70]

122.    GA functions through specific collection settings and fixed data transmission paths. Google acknowledges the legal implications of those practices and assigns responsibility for visitor disclosure to website developers, including Defendant.

123.    Here, Defendant added GA to the Website. That implementation caused Plaintiff's webpage views to be intercepted and transmitted to Google, as shown by the example taken directly from the Website below:

---

[69] *About the Google tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited May 6, 2026).
[70] *Id.*







40



*Figure 17 – Test search made on the Website resulted in sharing search terms with Google Analytics*

124.    After the data reaches those common destinations, Google products analyze the information and provide feedback that allows Defendant to monetize the collected data through targeted advertising.

**D.    Defendant Programmed the Website to Include the Tracking Tools**

125.    Defendant owns and operates the Website, which provides access to online articles, videos, and other multimedia content covering business, finance, technology, leadership, and related news and informational programming.

41

126. Defendant controls the Website's software code and intentionally integrated the Website with the Tracking Tools, which intercept users' Sensitive Information and transmit the same to the Tracking Entities.

127. When users interact with the Website by navigating pages, clicking links, or entering information, they transmit Sensitive Information directly to Defendant.

128. The Tracking Tools placed on users' devices during interactions with the Website intercept and record users' communications for the Tracking Entities, enabling real-time tracking and collection of users' Sensitive Information.

129. Defendant voluntarily integrated the Tracking Tools into the Website's code. Defendant's use of Tracking Tools on the Website is performed pursuant to commercial agreements between Defendant and the Tracking Entities.

130. The Website's Privacy Banner stated that:

> The website uses cookies and other tracking technologies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising, and analytics partners. For more information, see our **Privacy Policy** and **California Notice At Collection and Privacy Policy**.[71]

131. In the Privacy Policy, Defendant provides additional disclosures regarding its use of cookies and states that Defendant and its service partners collect or receive information concerning users' interactions with the Website.

> We and service providers or partners we engage to provide content, advertising, functionality, product and service offers and other services or that measure and analyze ad performance, user behavior on the Services or product/service categories of interest to users, or attribute commission for affiliate links may use cookies, web beacons, software development kits and other similar technologies to understand usage of the Services and improve our content and offerings and to deliver advertisements in which you might be interested and to attribute commission for

---

[71] *See Figure 18* (emphasis in original).

affiliate links. These technologies collect statistical and other information, including personal information, about you and your use of the Services….[72]

## IV. Defendant Falsely Informed Users that They Could Control the Sale or Sharing of Their Personal Information

132.    When users visited the Website before and on January 14, 2026, they were presented with the Privacy Banner. The Privacy Banner informed users that Fortune used Tracking Tools to enhance the user experience and analyze performance and traffic, and further represented that Fortune shared information about users' interactions with the Website with social media, advertising, and analytics partners, including the Tracking Entities. The interface represented that users could exercise control over these practices by selecting options such as "Reject All" or "Do Not Sell or Share My Personal Information," thereby purportedly allowing users to opt out of cookies and the sale or sharing of their personal information.

133.    Defendant represented, in substance, that it would honor users' choice to limit or prevent the collection, use, and disclosure of their personal information by Tracking Entities.



*Figure 18 - Fortune's Privacy Banner representing users with an option of preventing the placement of cookies and the selling or sharing of their data*

---

[72] *U.S. Privacy Policy,* FORTUNE, https://fortune.com/privacy-policy/ (last visited May 6, 2026).

134. The Tracking Tools were enabled by default, and the system operated as an opt-out mechanism that requires users' action to disable tracking.

135. Defendant's Privacy Banner led Plaintiff and similarly situated Website users to believe that they had disabled the sale or sharing of their information and all cookies. The Privacy Banner also led users to believe that Defendant would not allow Tracking Entities to access users' Sensitive Information in connection with the Website's use of Tracking Tools.

136. These representations were false. Defendant did not comply with users' expressed preferences. When users selected to opt out of the sale or sharing of personal information and/or to reject all cookies, they communicated that they did not consent to the placement or transmission of Tracking Tools, including cookies. Defendant nevertheless caused Tracking Tools, including those from Google and Piano, to be placed on users' browsers and devices, thereby causing users' Sensitive Information to be transmitted to at least Google and Piano. Certain aspects of the operation of Tracking Tools on the Website can be observed using browser developer tools that record network traffic transmitted to and from a user's device while the user interacts with the Website.

137. Network traffic logs generated through these tools reveal HTTP requests and transmissions between users' browsers and Tracking Entities during users' visits to and interactions with the Website.



*Figure 19 – Screenshot depicting Developer Tool on visitor's browser to record and capture network activity*

138.    These network logs demonstrate that, even after users refused consent and affirmatively rejected the sale or sharing of their personal data, users' browsers continued to transmit numerous GET and POST HTTP requests to Google and Piano and continued to use Tracking Tools to track users.





46





*Figure 20 – Piano Analytics tracking a users who rejected the sale or sharing of their personal information*









*Figure 21 – Google Analytics tracking a visitor who rejected the sale or sharing of their personal information*

139.    Through these ongoing transmissions, Website users' Sensitive Information was disclosed to Tracking Entities. The Tracking Entities and Tracking Tools track users across websites and over time, correlate visitor behavior with other datasets, and compile detailed visitor profiles reflecting preferences, behaviors, demographics, and inferred characteristics. This information is monetized for advertising, analytics, and marketing purposes. The Tracking Tools executed on users' browsers enable Tracking Entities that are separate from the parties to the

49

communications to access and use users' Sensitive Information. These Tracking Entities collect and use the intercepted communications for their own commercial purposes.

140.    Defendant removed the Privacy Banner from the Website on some date after January 14, 2026. However, the Website continues to use Tracking Tools and place cookies on users' browsers without their consent. Additionally, this change does not cure any harm done to users before the removal of the Privacy Banner.

**V.      Plaintiff Did Not Consent to Defendant's Sharing of His Sensitive Information**

141.    Plaintiff was unaware that the Tracking Tools intercepted his confidential communications with the Website.

142.    Plaintiff reasonably believed that his communications with the Website were made in confidence.

143.    Defendant provided no notice identifying who intercepted, recorded, or used the contents of those communications. Plaintiff, therefore, had no opportunity to provide consent to the interception of his search terms.

144.    Piano and TradeDesk warn website operators that using their tracking tools requires notice and valid consent before collecting protected visitor data or allowing Tracking Entities to intercept it. Defendant agreed to those terms to deploy the Tracking Tools.

145.    Despite those requirements, Defendant provided Plaintiff with no notice that the Tracking Tools operated on the Website.

146.    Plaintiff, therefore, did not and could not consent to the collection or sharing of his data when visiting the Website, running searches, or requesting or obtaining videos.

**VI.     By Disclosing Subscriber's PII to Piano, Defendant Violated the VPPA**

147.    The VPPA at 18 U.S.C. § 2710(b)(1) prohibits video tape service providers from disclosing the personally identifiable information of their consumers to a third party.

148.  The VPPA ensures that businesses and people who sell or deliver video tapes, or similar audio video content, do not reveal their consumers' history of requesting or obtaining specific audio video materials to any other party.

149.  Defendant, through its disclosure of the browsing and viewing activities of its Subscribers to Piano, violated the VPPA.

150.  Defendant qualifies as a "video tape service provider" under the VPPA because it creates and delivers ad-supported and subscription-supported audio video content through its Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

151.  Defendant curates, hosts, provides access to, and delivers thousands of videos on the Website, both included within articles and as standalone webpages.

152.  Defendant's Website features a substantial library of video content, including news clips, documentaries, and various Fortune videos, which consumers may request and view directly through their browsers.

153.  The VPPA defines a "consumer" as any "renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

154.  Plaintiff and other Subscribers are "consumers" because they subscribed to the Website, either by creating an account, or by exchanging their valuable personal information in exchange for emails from the Website. The VPPA defines "personally identifiable information" (PII) as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

51

155.    Defendant disclosed to Piano the name and description of the videos that Plaintiff watched, the URL of the webpages that Plaintiff viewed, and the first name, last name, email account, and general location of Plaintiff. This information is PII, as it discloses the Plaintiff's identity and the video materials he requested and viewed from the Defendant.

156.    Plaintiff's and the Class Members' PII was transmitted in key-pair values contained in data files, rather than embedded in URLs, which clearly separated the data by category and value, including consumers' personal addresses, URLs, and titles of audio-visual materials.

**TOLLING**

157.    Defendant's conduct tolled the statutes of limitations applicable to Plaintiff's and the Class Members' claims, based on delayed discovery.

158.    Plaintiff and the Class Members did not know, and could not have known, that the Tracking Tools disclosed their information and communications to Tracking Entities when they used the Website. Reasonable diligence would not have revealed Defendant's conduct.

159.    Defendant embedded the Tracking Tools into the Website without disclosure, providing no indication that communications would be shared with Tracking Entities.

160.    Defendant possessed exclusive knowledge that the Tracking Tools would disclose protected information and confidential communications. Defendant failed to disclose that interacting with the Website would result in disclosure of Sensitive Information to Tracking Entities.

161.    The technical nature of the Tracking Tools prevented the discovery of the full scope of Defendant's conduct. No disclosures or visible indicators alerted a reasonable visitor to interception or disclosure.

162.    Plaintiff and the Class Members first learned of Defendant's conduct through investigation conducted in preparation for this action.

## CLASS ACTION ALLEGATIONS

163.    Plaintiff brings this action individually and on behalf of the following Classes:

**Nationwide Class**: All persons in the United States who visited the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "Class").

**Subscriber Subclass**: All persons who subscribed to the Website and watched videos on the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "Subscriber Subclass")

164.    Specifically excluded from the Class and Subclass are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

165.    Plaintiff reserves the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

166.    This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

167.    Numerosity (Rule 23(a)(1)): At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

53

168.    Typicality of Claims (Rule 23(a)(3)): Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used the Website and had his Sensitive Information collected and disclosed by Defendant.

169.    Adequacy of Representation (Rule 23(a)(4)): Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has no interests antagonistic to, nor in conflict with, the Classes. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

170.    Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class and Subclass Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class and Subclass Members to seek redress for the wrongful conduct asserted herein. If class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

171.    Commonality and Predominance (Rule 23(a)(2), 23(b)(3)): There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class and Subclass that predominate over questions that may affect individual members of the Class and Subclass include:

   a.    Whether Defendant collected Plaintiff's and the Class Members' Sensitive Information;

   b.    Whether Defendant unlawfully disclosed and continues to disclose the Sensitive Information of users of the Website in violation of the federal Wiretap Act;

    c.       Whether Defendant's disclosures were committed knowingly; and

    d.       Whether Defendant disclosed Plaintiff's and the Class Members' Sensitive Information without consent.

172. Information concerning Defendant's Website's data-sharing practices is available from Defendant or the Tracking Entities.

173. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

174. The prosecution of separate actions by individual members of the Class and Subclass would risk inconsistent or varying adjudications and establish incompatible standards of conduct for the Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

175. Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

176. Given that Defendant's conduct is ongoing, monetary damages are insufficient, and there is no complete and adequate remedy at law.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF THE FEDERAL WIRETAP ACT**
**18 U.S.C. § 2510, et seq.**
**(On Behalf of Plaintiff and the Class)**

177. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

178. Plaintiff brings this cause of action on behalf of himself and all Class Members.

179. The federal Wiretap Act, codified at 18 U.S.C. § 2510 et seq., prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

180. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

181. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

182. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

183. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

184. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

185. Defendant is a "person" within the meaning of the Wiretap Act.

186. The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

187. Plaintiff had a reasonable expectation of privacy in his electronic communications with Defendant's Website, including his searches, browsing activity, and video watching activity,

particularly where Defendant represented through its Privacy Banner and Privacy Policy that users could opt out of the sale/sharing of personal information.

188.     A reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on a website are sensitive. Such communications include searches, website selections, and video watching activity. They convey the substance and meaning of the communication.

189.     Plaintiff, as a reasonable user, is entitled to assume that disclosure of the contents of their communications occurs lawfully and with consent. The opposite assumption would require users to expect routine violations of their privacy.

190.     Plaintiff reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of his electronic communications with Defendant's Website.

191.     During the relevant time period, Plaintiff's electronic communications with the Website were intercepted at the moment they were sent and transmitted to Tracking Entities without Plaintiff's consent. The intercepted information was monetized. Defendant combined that information with data collected about Plaintiff across the internet and used it for advertising, analytics, and marketing optimization.

192.     Interception occurred whenever Plaintiff interacted with the Website, including when he navigated webpages, used search features, viewed articles and videos, or otherwise communicated information to the Website through his browser.

193.     At all relevant times, Defendant acted knowingly, willfully, and intentionally. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on the Website and understood that doing so would result in the interception and transmission of users' communications to Tracking Entities.

194.    Plaintiff was not asked to consent to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. Plaintiff instead affirmatively declined sharing/selling his personal information through Defendant's Privacy Banner.

195.    The unauthorized interception and use of Plaintiff's electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a). As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including: (1) damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiff and any profits made by the intercepting parties as a result of the violations, or (b) statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and (3) reasonable attorneys' fees and costs.

## COUNT II
## VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, et seq.
### (On Behalf of Plaintiff and the Subscriber Subclass)

196.    Plaintiff hereby incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

197.    Plaintiff brings this count on behalf of himself and all Subscriber Subclass Members.

198.    The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

58

199. The VPPA also prohibits direct marketers from using disclosed titles and descriptions of videos to market goods and services directly to consumers. 18 U.S.C. § 2710(b)(2)(D)(ii).

200. "[P]ersonally identifiable information" ("PII")is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

201. A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

202. Defendant violated this statute by knowingly disclosing Plaintiff's and Subscriber Subclass Members' PII to Piano.

203. Through the Website, Defendant engaged in the business of delivering video content to Subscribers, including Plaintiff and the Subscriber Subclass Members. The Website delivers videos to Subscribers, including Plaintiff and the Subscriber Subclass Members, by transmitting the content of the videos from its servers to Plaintiff's and Subscriber Subclass Members' devices.

204. Defendant is a "video tape service provider" because Defendant curates, hosts, provides access to, and delivers thousands of videos on the Website, both included within articles and as standalone webpages, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

205. Defendant solicits individuals to pay to and/or subscribe to the Website.

59

206.    Plaintiff and members of the Subscriber Subclass are "consumers" because they subscribe to Defendant's Website. 18 U.S.C. § 2710(a)(1).

207.    Plaintiff and members of the Subscriber Subclass requested, obtained, and viewed videos on the Website.

208.    Defendant disclosed Plaintiff's and the Subscriber Subclass Members' PII to Piano. Defendant utilized Piano Analytics, which transmitted Plaintiff's and the Subscriber Subclass Members' identifying information, like their first and last names, email addresses, along with Plaintiff's and the Subscriber Subclass Members' event data, including the titles, URLs, and descriptions of the videos they viewed, to Piano.

209.    Defendant knowingly disclosed Plaintiff's and the Subscriber Subclass Members' PII, which is triggered automatically through Defendant's use of the Piano Analytics. No additional steps on the part of the Defendant, Piano, or any Tracking Entities are required. Once Piano's routine exchange of information is complete, the email address that becomes available can be used by any individual to easily identify a Subscriber.

210.    Plaintiff and members of the Subscriber Subclass did not provide Defendant with any form of consent, either written or otherwise, to disclose their PII to Piano. Defendant failed to obtain "informed, written consent" from subscribers – including Plaintiff and members of the Subscriber Subclass – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

211. Defendant's disclosures of Plaintiff's and Subscriber Subclass Members' PII were not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Piano were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2). Instead, Plaintiff's and Subscriber Subclass Members' PII was used for improving marketing effectiveness.

212. In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(b)(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

213. On behalf of himself and the Subscriber Subclass, Plaintiff seeks: (i) declaratory relief as to Defendant; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Subscriber Subclass by requiring Defendant to comply with the VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## COUNT III
### INVASION OF PRIVACY; INTRUSION UPON SECLUSION
### (On Behalf of Plaintiff and the Class)

214. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

215. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against the Defendant.

216.     Defendant intentionally intruded upon Class Members' solitude or seclusion in that it effectively placed the Tracking Entities in the middle of conversations, including Sensitive Information to which it was not an authorized party.

217.     Defendant's participation in the Tracking Entities' tracking and interception of Sensitive Information was not authorized by Plaintiff or the Class Members.

218.     Defendant's enabling of the Tracking Entities' intentional intrusion into Plaintiff's and the Class Members' internet communications, including Sensitive Information, was highly offensive to a reasonable person in that they violated federal and state criminal and civil laws designed to protect individuals' privacy and against theft.

219.     Secret monitoring of Sensitive Information is a highly offensive behavior.

220.     Plaintiff attempted to use the Privacy Banner to prevent this intrusion upon his privacy. Despite Defendant's representations, the Privacy Banner failed to prevent this intrusion.

221.     Wiretapping and the surreptitious recording of communications, including PII, is highly offensive behavior.

222.     Plaintiff and Class Members were harmed by Defendant's facilitation of Tracking Entities' intrusion upon their seclusion. Plaintiff and Class Members are entitled to reasonable compensation, including disgorgement of profits derived from unlawful internet tracking.

**COUNT IV**
**COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION**
**(On Behalf of Plaintiff and the Class)**

223.     Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

224.     Plaintiff brings this cause of action on behalf of himself and all Class Members.

62

225. Defendant made affirmative representations to visitors through the Privacy Banner and related disclosures. Defendant represented that visitors could opt out of the sale or sharing of personal information.

226. Defendant represented that exercising those options would limit or prevent the deployment of Tracking Tools, including targeting and performance cookies, and would stop the transmission of visitors' browsing activity, interactions, and related data to the Tracking Entities.

227. Defendant made these representations when visitors accessed the Privacy Banner.

228. These representations were false and misleading. After users, including Plaintiff, exercised their opt-out choices and declined the sale and sharing of their personal information, Defendant continued to deploy Tracking Tools and continued to transmit visitor data to Tracking Entities.

229. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

230. Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential tracking technologies based on user preferences, and Defendant could have implemented such measures.

231. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiff, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

232.    Plaintiff and the Class Members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

233.    Plaintiff's reliance was reasonable because Defendant presented the Privacy Banner as a mechanism for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

234.    As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff and the Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data.

235.    Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out.

236.    Plaintiff and the Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

## COUNT V
### UNJUST ENRICHMENT
**(On Behalf of Plaintiff and the Class)**

237.    Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

238.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

239.    Defendant obtained a benefit by collecting, processing, and enabling Tracking Entities' monetization of Plaintiff's and Class Members' Sensitive Information, which Defendant

then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

240. Defendant retained those benefits under circumstances in which the information was collected and transmitted without valid consent. The information was collected and transmitted in breach of Defendant's representations to visitors. Defendant's retention of those benefits is unjust.

241. Plaintiff and the Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiff and the Class. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiff and Class Members are entitled to the relief set forth below

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

1. For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Class and Subclass and their counsel as Class Counsel;

2. For an order declaring the Defendant's conduct violates the statutes referenced herein;

3. For an order finding in favor of Plaintiff and the Class and Subclass on all counts asserted herein;

4. Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the

Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

5.    An award of statutory damages or penalties to the extent available;

6.    For damages in amounts to be determined by the Court and/or jury;

7.    For pre-judgment interest on all amounts awarded;

8.    For an order of restitution and all other forms of monetary relief;

9.    An award of all reasonable attorneys' fees and costs; and

10.    Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Dated: May 7, 2026

**LEVI & KORSINSKY, LLP**

By: *S/ Mark S. Reich*
Mark S. Reich (MR-4166)
Gary Ishimoto *
Christopher V. DeVivo (5969787)
Michael N. Pollack (6173272)
Albulena Uka (6304513)
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: gishimoto@zlk.com
Email: cdevivo@zlk.com
Email: mpollack@zlk.com
Email: auka@zlk.com

*Counsel for Plaintiff*

**pro hac vice* forthcoming

66